UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

DAVID PATTERSON                                                                           PLAINTIFF

V.                                                                CIVIL ACTION NO. 3:23-CV-3-DPJ-ASH

UNITED STATES OF AMERICA                                                             DEFENDANT

REPORT AND RECOMMENDATION

This case is before the Court on Defendant the United States of America's Motion for Summary Judgment [97] seeking dismissal of all claims asserted by pro se Plaintiff David Patterson. Patterson opposes the motion [99]. Having considered the submissions, testimony at the May 14, 2024 omnibus hearing, and applicable law, the undersigned recommends that Defendant's summary-judgment motion be granted.

I.      Facts and Procedural History

Plaintiff David Patterson is an inmate in the custody of the Federal Bureau of Prisons ("BOP"). He is proceeding pro se and in forma pauperis, subject to the Prison Litigation Reform Act ("PLRA"), and brings this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). *See* Compl. [1] at 1; Order [11] at 1–2.

The events giving rise to this suit occurred when Patterson was housed at the Federal Correctional Institution in Yazoo City, Mississippi ("FCI-Yazoo"). Compl. [1] at 4–15. Patterson's allegations relate to his housing and lack of an opportunity to participate in mental health programs as well as two specific incidents that occurred on April 25, 2022, and April 30, 2022, while he was housed on suicide watch. *Id*. at 4–15. He complains that FCI-Yazoo prison officials were (a) negligent in supervising him by supplying him with a bottle of ibuprofen and also in failing to take it away from him, and also because he obtained a razor blade he used to cut

himself; (b) negligent in failing to provide him with immediate medical care after he notified prison officials that he had cut himself with a razor blade; (c) negligent in housing him at FCI-Yazoo which is a care level 1 facility; and (d) negligent in failing to provide him with an opportunity to participate in mental health programs. Omnibus Order [65] at 1–2. Patterson testified to these claims at the omnibus hearing held on May 14, 2024. *Id*.

Defendant argues that "Patterson has failed to exhaust all his administrative remedies, has failed to provide expert testimony to prove the elements of his medical malpractice claim, and failed to prove a prima facie case of negligence." Def.'s Mot. for Summ. J. [97] at 1. Patterson filed a Response [99], and Defendant filed a Reply [104].

II.     Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The nonmovant must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th

Cir. 1994) (en banc). If contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). It must "interpret all facts and draw all reasonable inferences in favor of the nonmovant." *E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v. Cotton*, 572 U.S. 650, 660 (2014). But conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *S.E.C. v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37 F.3d at 1075.

These same summary-judgment rules apply to pro se parties. While the Court will liberally construe pro se arguments, a pro se nonmovant must offer evidence showing a genuine issue of material fact to defeat a motion for summary judgment. *Baughman v. Seale*, 761 F. App'x 371, 378 (5th Cir. 2019).

"A genuine dispute of material fact exists 'if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.'" *Ahders v. SEI Priv. Tr. Co.*, 982 F.3d 312, 315 (5th Cir. 2020) (quoting *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)). "If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Norwegian Bulk Transp. A/S v. Int' l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477, 325 (1986)). The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant. *Maddox v. Townsend & Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011).

III.    Analysis

Patterson brings his claims under the FTCA, 28 U.S.C. § 1346(b), claiming negligent care and medical malpractice by prison officials while incarcerated at the FCI-Yazoo. Compl. [1] at 1, 3–15; Tr. 11–60. The United States has consented through the FTCA to be sued for "injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). Under the FTCA, a plaintiff may "bring certain state-law tort suits against the Federal Government." *Brownback v. King*, 592 U.S. 209, 210–11 (2021) (citing 28 U.S.C. §§ 1346(b) & 2674). "A claim is actionable if it alleges the six elements of § 1346(b), which are that the claim be:

> '[1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'"

*Brownback*, 592 U.S. at 212 (citations omitted). "In FTCA cases, the federal courts rely on the substantive law of the state where the alleged wrongful act occurred." *Sangernetta Mason, A1C v. United States*, 372 F. App'x 504, 505 (5th Cir. 2010) (citations omitted); *see also Brownback*, 592 U.S. at 212. Because Patterson alleges the wrongful conduct occurred at a federal prison in Mississippi, Mississippi state law applies.

    A.    Patterson's housing and lack of opportunity to participate in mental health programs claims

Patterson includes claims challenging his housing assignment at a Level 1 care facility at FCI-Yazoo instead of a Level 2 care facility and lack of opportunity to participate in mental health programs. A plaintiff cannot file a lawsuit under the FTCA "unless [he] has first exhausted his administrative remedies." *McNeil v. United States*, 508 U.S. 106, 107 (1993)

4

(citing 28 U.S.C. § 2675(a)). Patterson admitted at the omnibus hearing that he had not exhausted his administrative remedies about these two claims. Tr. [63] at 59:12–18. Absent exhaustion, he cannot pursue his FTCA claims related to his housing assignment and lack of ability to participate in mental health programs. *See Stilley v. Garland*, No. 21-60022, 2022 WL 1568363, at *1 (5th Cir. May 18, 2022) (noting that plaintiff "has the burden of proving that he exhausted his claims administratively") (per curiam and unreported). The lack of exhaustion divests the Court of jurisdiction over these claims. *Gregory v. Mitchell*, 634 F.2d 199, 203–04 (5th Cir. 1981) ("The requirement of exhaustion of administrative review is a jurisdictional requisite to the filing of an action under the FTCA. . . . [It] cannot be waived."). The undersigned therefore recommends these claims be dismissed without prejudice.

B. Patterson's claim that BOP staff were negligent in supplying him a bottle of ibuprofen while on suicide watch

Patterson complains that the medical staff at Yazoo-FCI were negligent in giving him a bottle of ibuprofen on April 25, 2022, while he was on suicide watch. Compl. [1] at 4–5. At the omnibus hearing, Patterson testified that while he was on suicide watch he requested ibuprofen for his back pain. Tr. [63] at 12:4–11. He had been "prescribed self-carry ibuprofen 800mg" and he "instructed the medication technician that he needed a refill . . . as he was having some pain." Ackermann Stmt. [97-3]. He was "still prescribed the self-carry ibuprofen . . . and was given a refill of a 10-day supply (30 tablets) . . . ." *Id.* Patterson claims he was observed by Officer Cannon, who "was in charge of unlocking the food slot, allowing the nurse to - - pharmacy to pass me the Ibuprofen." Tr. [63] at 12:12–16. The "nurse" or "pharmacy"[1] supplied him with "a whole prescription bottle"—"[i]t was like 3,800 milligrams of Ibuprofen." Tr. [63] at 12:15–19.

---

[1] Patterson sometimes refers to the person who dispensed the ibuprofen to him as a member of the pharmacy staff, and other times as a nurse. Defendant identifies the person as a medication technician. It is undisputed that both parties assert this person was a medical professional.

5

He also testified that the staff knew of his history to self-harm, including overdosing. *Id*. at 12:25. Patterson notified Officer Cannon that he was not allowed "to have all these pills." *Id*. at 13:2–4. According to Patterson's testimony, Officer Cannon told Patterson "oh, she'll be back. They said you can have them. You all right." *Id*. at 5–6. Patterson then started taking the pills. *Id*. at 11. When "the officer came up," and asked Patterson "[w]hat are you doing?," Patterson responded that he had taken all the ibuprofen. *Id*. at 13–14. The medical professional returned, and Patterson was taken by ambulance to the emergency room and admitted to "the hospital." *Id*. at 14:1–2, 14. Patterson states that he suffered for about 24 hours from severe stomach cramps, nausea, burning pains in his throat, and burning pains when going to the bathroom. Tr. [63] at 26:13–14, 19–20; 26:12.

Defendant argues that Patterson's claim that the FCI-Yazoo medical staff were negligent in giving him a bottle of ibuprofen is one of medical malpractice. Def.'s Memo. in Supp. [98] at 8. In response, Patterson says that he "den[ies] having any medical malpractice claim against the United States; instead, Mr. Patterson proceeded solely on a theory of negligence." Pl.'s Resp. [99] at 14. Defendant's Reply [104] asserts that "[w]hile Patterson seeks to circumvent the need for expert testimony by attempting to frame this claim as a general negligence claim, the facts indicate that this is actually a claim of medical negligence." Def.'s Reply [104] at 2. Defendant further asserts that Patterson directed his request for pain medication to the pharmacy staff, not Officer Cannon. Def.'s Reply [104] at 2.

The documentation prepared by the BOP's Psychology Services department aids in evaluating the nature Patterson's claims. On April 22, 2022, three days before the ibuprofen incident, Chief Psychologist Adu Boateng, Ph.D., completed a Suicide Risk Assessment (SRA) placing Patterson on suicide watch "out of an abundance of caution." Apr. 22, 2022 SRA [97-2]

6

at 13–14. The SRA states: "It is advised that [Patterson] be authorized ONLY a suicide smock, blanket, and tear resistant mattress." *Id.* at 14. It also advised food services "not to provide plastic utensils and to leave any items which may be used for self injury (e.g. chicken bones) off the food tray." *Id.*

After Patterson consumed the bottle of ibuprofen, Dr. Boateng prepared another SRA. Apr. 25, 2022 SRA [97-2] at 10–12. It notes "[t]he Medical Officer reported inmate PATTERSON had been given a pill bottle containing the [ibuprofen] tablets earlier today." *Id.* at 10. It also reports that Patterson "acknowledged understanding he was not supposed to have the pills while on suicide watch." *Id.* at 12. This second SRA addressed Patterson's access to medication: "Consultation was sought with the Clinical Director regarding restricting his means to all medication." *Id.*

Dr. Boateng summarizes a follow-up encounter with Patterson in an April 29 Suicide Watch Contact (SWC). Apr. 29, 2022 SWC [97-2] at 7–9. That report indicates that he and Patterson "[d]iscussed [the] recent ingestion of pills" and that Patterson (presumably) "reported Health Services is to blame for the incident." *Id.* at 7. Health Services comes up again during an April 30 encounter, during which Patterson "reported he is still frustrated with his lack of perceived attention from Health Services" and that "they are 'being vindictive because I swallowed the pills.'" Apr. 30, 2022 SWC [97-2] at 5. Dr. Boateng reports "[w]e were able to address his concern with health services when they came to administer his medication." *Id.*

Dr. Boateng removed Patterson from suicide watch on May 4, but advised "Health Services . . . [Patterson] should remain on PILL LINE ONLY medication." May 4, 2022 Post Suicide Watch Rpt. [97-2] at 1–2. "Pill Line Only" means "[a] restriction placed on controlled substances, psychotropics, . . . and some other drugs, requiring that a single dose of the drug be

7

administered to an inmate by a qualified employee at a designated time and place." Federal BOP Health Services, *National Formulary Part I*, at 8, *available at* https://www.bop.gov/resources/pdfs/2020_winter_formulary_part_1.pdf [https://perma.cc/K87P-9Z5W].

When Patterson was placed on suicide watch, Dr. Boateng recommended he be restricted to a suicide smock, blanket, a special mattress and restricted, and food items that were not susceptible to self-harm. But Dr. Boateng did not provide any recommendation restricting his access to medication until after this incident. Patterson had a prescription for self-carry ibuprofen, and he requested and was given a refill of that medication while on suicide watch. Patterson's claim of negligence is that Defendant's medical professional should not have dispensed to him his prescribed, self-carry medication while he was on suicide watch. Whether it was negligent for the medical professional to give this type and quantity of medication to Patterson involves professional medical judgment about what is and is not safe for an inmate on suicide watch. Patterson's claim is therefore one of medical malpractice. *See Joseph ex rel. Wrongful-Death Beneficiaries of Reginald Joseph v. United States*, No. 3:22-CV-193-DPJ-FKB, 2023 WL 11113879, at *2 (S.D. Miss. Nov. 14, 2023) (finding that a claim of overdose by caregivers at the Veterans Affairs Medical Center was medical malpractice).

A prima facie showing under Mississippi law of medical malpractice requires

> a plaintiff, (1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identifying and articulating the requisite standard of care; and (3) establishing that the defendant physician failed to conform to the standard of care. In addition, (4) the plaintiff must prove the physician's noncompliance with the standard of care caused the plaintiff's injury, as well as proving (5) the extent of the plaintiff's damages.

*Id*. (quoting *Cheeks v. Bio-Med. Applications, Inc.*, 908 So. 2d 117, 120 (Miss. 2005) (citing *McCaffrey v. Puckett*, 784 So. 2d 197, 206 (Miss. 2001)). "When proving these elements in a medical malpractice suit, expert testimony must be used. Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." *Id*. (quoting *Hubbard v. Wansley*, 954 So. 2d 951, 957 (Miss. 2007) (quoting *Barner v. Gorman*, 605 So. 2d 805, 809 (Miss. 1992)).

In support of its summary judgment motion, Defendant submits Patterson's medical records. Med. Recs. [97-8]. It also submits a declaration from Stacey L. Hail, MD, FACMT, who was designated by Defendant as an expert witness on the pharmacology of Patterson ingesting 30 pills of 800 mg ibuprofen. Hail Decl. [97-12]. In her declaration, Dr. Hail discussed the standard of care recommended for an overdose of ibuprofen. *Id.* at 2–3. She also opined that "[t]he overdose of ibuprofen is generally very safe," that Patterson's medical records showed that "he was asymptomatic from the ibuprofen ingestion with normal laboratories," and that "[t]he amount of ibuprofen ingested by Patterson was not toxic or lethal." *Id*. In his response, Patterson offers no probative summary-judgment evidence to refute Dr. Hail's declaration that his ingestion of the ibuprofen did not cause his injuries.

Importantly, Patterson offers no medical expert testimony on the applicable medical standard of care or that Defendant's medical professionals breached that standard. Patterson also lacks an expert to "establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." *Joseph*, 2023 WL 11113879, at *2. His failure to submit medical expert testimony requires dismissal of his claim. *Id.*; *see also Massey v. United States*, 565 F.

App'x 326, 328 (5th Cir. 2014) (affirming dismissal of FTCA claim for failure to offer medical expert testimony to support medical causation).

Patterson does not directly raise the layman's exception to Mississippi medical expert requirement. But he does argue his claim is one of ordinary negligence, so the Court will address whether the exception applies. "The layman's exception to the necessity of expert medical testimony provides that lay testimony in a medical malpractice case may be acceptable as to matters that are purely factual in nature or thought to be within the common knowledge of a lay person." *Wilke v. United States*, No. 1:07-CV-465-LG-JMR, 2009 WL 590306, at *2 (S.D. Miss. Mar. 5, 2009) (citing *Smith v. Gilmore Mem'l Hosp., Inc.*, 952 So. 2d 177, 181 (Miss. 2007)).

The layman's exception is inapplicable here because the reasonableness of giving 30 pills of 800 mg ibuprofen to an inmate on suicide watch is not a factual matter or within the knowledge of a lay person. This is not a case where a patient was given the *wrong* medication or where an item was erroneously left inside someone. *See generally Crosthwait v. So. Health Corp. of Houston, Inc.*, 94 So. 3d 1126, 1130 (Miss. Ct. App. 2011) (collecting cases and holding the selection of a shower stool for a hospitalized patient was medical negligence outside of a layman's knowledge). Rather, Patterson requested—while on suicide watch—that Defendant's medical professionals refill his self-carry ibuprofen prescription. And they did. Whether that decision to dispense medication to Patterson breached the applicable standard of care and caused Patterson's injuries is a matter of professional judgment necessitating expert testimony.

The layman's exception is also inapplicable to establish causation. As a result of ingesting the 30 pills of 800 mg ibuprofen, Patterson claims that for about 24 hours he suffered severe stomach cramps, nausea, burning pains in his throat, and burning pains when going to the bathroom. But whether the damages he claims were proximately caused by his consumption of

10

that medicine is not obvious or within a lay person's knowledge. The only expert opinion proffered in this action illustrates why Patterson's *lack* of an expert is dispositive. In her unrebutted opinion, Dr. Hail explained that the "overdose of ibuprofen is generally very safe." Hail Decl. [97-12] ¶ 4. Based on her review of Patterson's medical records, including his contemporaneous reporting of symptoms to medical staff following his overdose, Dr. Hail opined Patterson "was asymptomatic from the ibuprofen ingestion" and "never developed any gastrointestinal symptoms or laboratory abnormalities." *Id.* ¶¶ 6–7. In fact, she opined the amount he consumed, 255 mg/kg, would not have warranted treatment at the emergency room because "he was just over the threshold prescribed by the" American Association of Poison Control Centers. *Id.* ¶ 4. It was only this amount coupled with his intentional ingestion that made an emergency room referral appropriate. *Id.* In summary, the only expert designated in this case testified that the "amount of ibuprofen ingested by Patterson was not toxic or lethal." *Id.* ¶ 7. This demonstrates why expert testimony is necessary for Patterson to establish that his consumption of 30 pills of 800 mg ibuprofen caused the harm he claims.

Nor can Patterson overcome the requirement of expert medical testimony by recharacterizing his claim to be that the officer on suicide watch failed to take away the medicine he observed the medical professional give to Patterson. Patterson's theory is essentially that the officer was negligent for failing to second-guess the medical professionals. But the officer's layperson opinion about the reasonableness of dispensing ibuprofen is no more admissible than Patterson's. *See* Patterson's Not. of Claim [97-11] (stating the officer declined Patterson's request to return the medication to the pharmacy because the officer "indicated that [the] Pharmacy Supervisor approved the administration of the pills"). Further, Patterson's theory that the officer should have taken the medicine away assumes the underlying act of dispensing the

11

medicine was negligent (and that consuming it caused Patterson's injuries). But Patterson has not established this underlying assumption and is unable to do so without medical expert testimony. He cannot circumvent the need for a medical expert testimony by claiming a layperson (the officer) was negligent in failing to correct the alleged medical malpractice (of the medical professionals).[2]

Patterson has failed to establish a genuine issue of material fact of negligence against Defendant as to the standard of care, whether it was breached, and causation relating to the overdose of ibuprofen. The undersigned recommends that Defendant's Motion for Summary Judgment [45] based on that claim be granted and that claim be dismissed with prejudice.

  C. Patterson's general negligence claim related to the razor blade and denial of immediate medical care

    1. Patterson's claim about the presence of a razor blade in his cell

Patterson asserts claims of general negligence by Defendant for failing to supervise him on April 30, 2022, to prevent the presence of a razor blade in his cell, which he used to cut himself. Compl. [1] at 7–9; Tr. 63 at 36–51. Because Mississippi law applies, Patterson is required to prove "1) duty, 2) breach, 3) cause (both in fact and proximate), and 4) damages." *McNerney v. United States*, No. 3:22-CV-684-CWR-LGI, 2025 WL 969246, at * 3 (S.D. Miss. Mar. 30, 2025) (quoting *Smith v. Minier*, 380 So. 3d 889, 893 (Miss. 2024)) (citation omitted). "[A] claim for negligence simply requires that the defendant failed to act as a reasonable person would under the same or similar circumstances, thereby breaching the applicable standard of

---

[2] Additionally, Dr. Boateng's April 25, 2022 SRA did not expressly advise against Patterson obtaining his prescribed medication. Even if it had, a decision by a medical professional to dispense medication contrary to an SRA advisory would be an exercise of professional medical judgment, and Patterson's claim would still be one for medical malpractice.

care." *Id*. (quoting *Sanderson Farms, Inc. v. McCullough*, 212 So.3d 69, 76 (Miss. 2017) (citation omitted)).

Patterson testified that he witnessed the search of the room before he was placed in it. Tr. [63] at 35:24–25; 36:1–10. Once in the room, Patterson "laid down and went to sleep." *Id*. at 36:16. He then heard a "loud bang on the door" and after a while, he went to the restroom and at that time, he saw the razor blade on the floor. *Id*. at 36:18–25; 37:1–2. Patterson testified that "the officer was asleep" and that "[the razor blade] had to have been thrown in there" or it "could have been overlooked." *Id*. at 37:8, 11; 39:15–16. Patterson did not make any effort to notify the officer that he had found a razor blade nor did he "attempt to kick it back under the door or anything like that." *Id*. at 40:10–14. Instead, within two minutes of finding the razor blade, he proceeded to self-harm by cutting himself. *Id*. at 41:16–18.

Defendant argues that Patterson lacks "evidence showing that BOP staff members were the proximate cause of his injuries." Def.'s Memo. in Supp. [98] at 14. Defendant points out that when Patterson was "asked where the razor came from, he testified that he was not sure, but assumed it was placed there by an officer." *Id*.; *see also* Tr. [63] at 38:7–14. Patterson further testified "that he didn't have any proof that an officer slid the razor under his door." Def.'s Memo. in Supp. [98] at 14; *see also* Tr. [63] at 38:15–25, 39:1–3. Patterson also stated that he "never saw or heard an officer put the razor blade in his room." Def.'s Memo. in Supp. [98] at 14; *see also* Tr. [63] at 39:4–9.

"[A] plaintiff in a negligence action must respond to a motion for summary judgment 'by producing supportive evidence of significant and probative value; this evidence must show that the defendant breached the established standard of care and that such breach was the proximate cause of her injury." *Evilsizer v. Beau Rivage Resorts, LLC*, 354 So. 3d 379, 382 (Miss. Ct. App.

13

2023) (quoting *Palmer v. Biloxi Reg'l Med. Ctr. Inc.*, 564 So.2d 1346, 1355 (Miss. 1990)). To establish causation based on circumstantial evidence, plaintiff's evidence "must be sufficient to make plaintiff's asserted theory reasonably probable, not merely possible, and more probable than any other theory based on such evidence." *Thomas v. Boyd Biloxi LLC*, 360 So. 3d 204, 214–15 (Miss. 2023) (quoting *Hardin v. Town of Leakesville*, 345 So. 3d 557, 566 (Miss. 2022) (quoting *Miss. Valley Gas Co. v. Est. of Walker*, 725 So. 2d 139, 145–46 (Miss. 1998), *overruled on other grounds by Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736 (Miss. 1999)). "[W]hen the evidence shows that it is just as likely that accident might have occurred from causes other than defendant's negligence, the inference that his negligence was the proximate cause may not be drawn." *Hardin*, 345 So. 3d at 566 (quotations omitted).

"[A] jury question exists only if [plaintiff] has offered competent record evidence creating a material factual dispute." *Sims v. Sam's East, Inc.*, No. 3:21-CV-261-DPJ-FKB, 2023 WL 7169093, at *2 (S.D. Miss. Feb. 9, 2023) (citing *Little*, 37 F.3d at 1075). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Id*. (quoting *TIG Ins. Co.*, 276 F.3d at 759 (5th Cir. 2002) (citing *S.E.C.*, 10 F.3d at 1087). As stated above, Patterson testified that he was not sure where the razor came from and that he did not have any proof that an officer placed the razor blade in his room. As noted in *Sims*, which is applicable here, "[plaintiff] cannot prove [defendant] is liable for what happened if [he] cannot prove what happened." *Id*.; *see also Evilsizer*, 354 So. 3d at 383–84 (finding defendant, which owned a cooking trailer and left it alongside a street for an event, was not liable for an accident caused by the trailer's awning being left open where there was no evidence defendant opened the awning or knew about it having been opened).

14

Patterson's Response [99] fails to present competent summary judgment evidence showing any negligence on the part of the prison officers, as to the existence or appearance of the razor blade, and fails to meet the basic elements of a negligence claim. Patterson asserts allegations in his Complaint, testimony at the omnibus hearing, and Response [99] that are vague, speculative, and conclusory about how the razor blade appeared in his cell and do not support his case beyond the realm of speculation and conjecture. He has failed to allege a genuine issue of material fact that any act or omission by the prison officer resulted in the existence or appearance of the razor blade. *See Sims*, 2023 WL 7169093, at *2–3; *see also Blank v. United States*, No. 4:14-CV-502-O, 2016 WL 8116679, * 8 (N.D. Tex. Dec. 2, 2016) ("[c]onclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment") (quoting *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010)). The undersigned therefore recommends that Defendant's Motion for Summary Judgment based on Patterson's negligence claim about the presence of the razor blade in his cell be granted and that claim be dismissed with prejudice.

    2.    Patterson's denial of immediate medical care after notifying prison officers about the self-harm razor blade incident

At the omnibus hearing, Patterson testified that after self-harming for about a minute, he went to the window and told Officer Newman what had happened. Tr. [63] at 41:23–24. Officer Newman called the shift lieutenant, Lieutenant Meredith. *Id*. at 42:13–14. When Lieutenant Meredith arrived, he asked Patterson "what's going on, man?" *Id*. at 45:18–20. Patterson then showed Lieutenant Meredith the razor blade and Lieutenant Meredith directed him to "throw that stuff out the slot, throw it out the food slot." *Id*. at 20–22. After Lieutenant Meredith opened the food slot, Patterson threw the razor blade out. *Id*. at 23.

Patterson attested that Lieutenant Meredith told him to "wrap toilet paper around your ankle to stop the bleeding," and "I see you Tuesday." *Id*. at 24–25; 46:2. Patterson did not request medical attention at that time. *Id*. at 47:6–8. This was a choice; he says he "figured that [he] wasn't going to get help with these people" so he decided he was "just going to wait for the next shift." *Id.* at 47:23–48:1. Patterson testified this incident occurred between 5:30 a.m. and 6:00 a.m., and later, at the shift change, he requested medical care and "they ended up getting me to medical." *Id*. at 46:22, 25; 48:2–3; *see also id.* at 16:25–17:4 (testifying that after he requested medical attention, the officer on duty "did contact medical, and they contacted psychology, and they sent me over to medical to get an observation"). He says that after he requested medical attention, it was "probably 20 minutes later . . . when they came and got [him]" to take him to get medical attention. *Id.* at 46:25–47:4. When he was received in medical, the nurse consulted with the doctor who directed that Patterson be taken to the emergency room. *Id*. at 17:4–11.

Defendant states that Patterson was taken to the hospital about 1:00 p.m. and returned to FCI-Yazoo the same day around 7:00 P.M. Def.'s Memo. in Supp. [98] at 12. Defendant adds that Patterson was treated at the hospital for wound care that did not include surgery as claimed by Patterson. *Id*. Instead, the surgery was conducted on April 27, 2022, "to remove a foreign object" Patterson had inserted on April 22, 2022.[3] *Id.* at 13.

Patterson argues that "on April 30, 2022, Officer Newman and Lieutenant Meredith violated a mandatory post order when they failed to inform the medical staff immediately when they notice[d] blood bleeding lightly around the ankle of Mr. Patterson at 6:15 a.m." Pl.'s Resp. [99] at 26; *see also* Suicide Watch Log [97-10] at 9–11.

---

[3] The medical records reflect that the surgery occurred on April 27, 2022, *see* Med. Recs. [97-8] at 12, instead of April 27, 2024, as stated in Defendant's Memorandum in Support of Motion for Summary Judgment [24] at 13.

16

"[W]hile the breach of an internal policy may provide some proof of negligence, it does not create a statutory duty in the first place." *Demoney v. Gateway Rescue Mission*, 304 So. 3d 652, 659 (Miss. Ct. App. 2020) (citing *Boyd Tunica, Inc. v. Premier Transp. Servs. Inc.*, 30 So. 3d 1242, 1249) (Miss. Ct. App. 2010)). Even assuming he can demonstrate a violation of the mandatory post order constitutes actionable negligence, Patterson fails to provide any evidence demonstrating that the failure to enforce it caused his injuries. The undisputed fact is Patterson never requested medical attention at the time of his initial interaction with the officers. He knew he could, but he instead elected to wait. It was only after a shift change that he sought medical care. And when he did request it, he promptly received it. Patterson cannot cause his own injury and create the delay in seeking medical attention to manufacture a negligence claim. In other words, assuming the officers had a duty to report and failed to do so, that is not the cause of Patterson's injury. *See Demoney*, 304 So. 3d at 659 (finding that "[n]o one and no policy" required plaintiff to take the action he did that caused in his injuries). The cause of his injury is his own self harm, and the cause of the delay is his failure to request medical attention. Because Patterson does not provide probative evidence that the prison officers caused Patterson's delay-in-care injury, the undersigned recommends that Defendant's Motion for Summary Judgment based on Patterson's negligence claim about denial of immediate medical care after notifying prison officers about the self-harm razor blade incident be granted and that this claim be dismissed with prejudice.

IV.    Recommendation

The undersigned has considered all arguments. For the reasons stated above, the undersigned recommends that the United States of America's Motion for Summary Judgment

17

[97] be granted. The undersigned recommends that Patterson's unexhausted claims be dismissed without prejudice, but that Patterson's other claims be dismissed with prejudice.

V.      Notice of Right to Object

In accordance with Federal Rule of Civil Procedure 72(b)(2), Local Rule 72(a)(3), and 28 U.S.C. § 636(b)(1), any party, within fourteen days after being served a copy[4] of this report and recommendation, may serve and file written objections to the recommendations, with a copy to the United States District Judge, the Magistrate Judge, and the opposing party. The District Judge at the time may accept, reject, or modify, in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to the undersigned with instructions. The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court for which there is no objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Alexander v. Verizon Wireless Services, L.L.C.*, 875 F.3d 243, 248 (5th Cir. 2017); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

RESPECTFULLY SUBMITTED, this the 15th day of August, 2025.

           *s/ Andrew S. Harris*
           UNITED STATES MAGISTRATE JUDGE

---

[4] When a document is served by mail, the party is considered to have been served on the date the document is mailed by the Court. *See* Fed. R. Civ. P. 5(b)(2)(C).